**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NOT FOR PUBLICATION

| | |
|---|---|
| In re:<br><br>J.P.R. MECHANICAL INC.<br>d/b/a JPR MECHANICAL, *et al.*,<br><br>_____Debtor. | Chapter 7<br><br>Case No. 19-23480 (DSJ) |
| MARIANNE T. O'TOOLE, solely in her capacity as Chapter 7 Trustee of the Estate of J.P.R. Mechanical Inc. d/b/a/ JPR Mechanical,<br><br>_____Plaintiff,<br><br>v.<br><br>RADIUM2 CAPITAL, LLC, f/k/a RADIUM2 CAPITAL, INC.<br><br>_____Defendant. | Adv. Pro. No. 21-07079 (DSJ) |
| MARIANNE T. O'TOOLE, solely in her capacity as Chapter 7 Trustee of the Estate of J.P.R. Mechanical Services Inc.<br><br>_____Plaintiff,<br><br>v.<br><br>RADIUM2 CAPITAL, LLC, f/k/a RADIUM2 CAPITAL, INC.<br><br>_____Defendant. | Adv. Pro. No. 21-07082 (DSJ) |

## DECISION ON MOTION OF PLAINTIFF FOR PARTIAL SUMMARY JUDGMENT

**APPEARANCES:**

**LAMONICA HERBST & MANISCALCO, LLP**
*Counsel to Plaintiff Chapter 7 Trustee*
3305 Jerusalem Ave., Suite 201

i

Wantagh, NY 11793
By:    Holly R. Holecek
       Salvatore LaMonica

**THE KANTROW LAW GROUP, PLLC**
*Counsel to Defendant*
732 Smithtown Bypass, Suite 101
Smithtown, NY 11787
By:    Fred S. Kantrow

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

The summary judgment motions before this Court seek to avoid three transfers made to

the defendant pursuant to merchant cash advance agreements. Numerous decisions of New York

state courts, several decisions of the District Court, and one opinion of the Second Circuit have

analyzed agreements like these to determine whether they constitute loans notwithstanding that

they are styled as being, or at least resembling, asset-sale agreements. Usually, those decisions

deal with claims of usury or civil-RICO violations. This decision addresses how the avoidable

preference provisions of the Bankruptcy Code apply to merchant cash advance agreements. The

Court concludes that here the Trustee has established an absence of any material factual dispute

and is entitled to avoid the transfers at issue.

Frequently under merchant cash advance agreements, a funder advances money to a

company in exchange for a specified percentage of that company's future revenues up to a

certain amount, while the funder and the company agree on an estimate of those future revenues

such that the funder may draw a fixed sum from the company's bank account daily until the

funder receives the agreed-upon amount. Also frequently, the company may request a change to

the daily draw amount if its revenues drop, and the agreements generally provide for

reconciliation of the daily draw amounts against the company's actual revenues. Courts

determining whether these arrangements are true asset sales, or, on the other hand, are in reality

loans, look to the substance of the parties' conduct and their agreements.

In bankruptcies, transfers made by a struggling and soon to be bankrupt company under a

merchant cash advance agreement may be the subject of clawback demands by the company's

bankruptcy trustee, with a central issue being whether the payments were on account of debt

owed to the merchant cash advance provider. Here, the Trustee argues that she is entitled to

summary judgment allowing the estate to avoid three transfers, all made under a merchant cash

advance agreement at a time when the future debtor was insolvent. The Court agrees, drawing

heavily from Judge Liman's thorough and well-reasoned decision in *Fleetwood Services, LLC v.*

*Ram Capital Funding, LLC*, No. 20-cv-5120 (LJL), 2022 WL 1997207 (S.D.N.Y. June 6, 2022)

("*Fleetwood*"). At bottom, the parties' agreements and their course of conduct – including even

that Radium2 filed proofs of claim in this case labeling itself a creditor who is owed money on

account of the agreements at issue – establishes that the obligations that led to the transfers

constituted debts as a matter of law, and, as such, were subject to avoidance in the circumstances

the Trustee has shown are present here.

## JURISDICTION

This Court has jurisdiction over this bankruptcy case, these adversary proceedings, and

these motions pursuant to 28 U.S.C. §§ 157(b), 1334, and the Amended Standing Order of

Reference M-431, dated January 31, 2012 (Preska, C.J.). These adversary proceedings and these

motions are core proceedings under 28 U.S.C. § 157(b)(2)(F) as proceedings to avoid and

recover alleged preferences.

## BACKGROUND

J.P.R. Mechanical Inc. ("Debtor" or "JPR") filed for Chapter 7 bankruptcy on August 16, 2019. J.P.R. Mechanical Services Inc. ("Services" and together with JPR, the "Debtors"), an affiliate of JPR, filed for bankruptcy at the same time. The Debtors operated as an HVAC subcontractor on large projects that proved beyond their ability to viably carry out. Trying to stave off collapse, they turned to merchant cash advance financing with multiple funders, including defendant Radium2 Capital, LLC ("Radium2" or "Defendant").

The Debtors ultimately failed. Their claims registers reflect around $200 million in claims. Marianne T. O'Toole, the Chapter 7 Trustee of the Debtors' procedurally consolidated bankruptcy estates ("Trustee" or "Plaintiff"), brought two adversary proceedings to recover certain prepetition transfers made to Radium2 as avoidable preferences and disallow claims filed by Radium2.[1] The Trustee served detailed requests for admissions, to which Radium2 failed to respond. The Trustee has moved for summary judgment in the JPR Lawsuit and the Services Lawsuit, and Radium2 also failed to timely respond to those motions, although it did file an untimely response and oppose the motions at a hearing. The Trustee's motion was accompanied by the statement required by Local Bankruptcy Rule 7056-1 identifying material facts as to which the movant asserts there is no genuine dispute; Radium2 filed a counterstatement that failed to specifically respond to each assertedly undisputed fact identified by the Trustee. This failure by Radium2 violated the express requirements of the Local Bankruptcy Rule which dictate that a failure to file specifically-targeted responses is deemed an admission of the matters

---

[1] The first adversary proceeding is *O'Toole v. Radium2 Capital, LLC*, No. 21-07079 (the "JPR Lawsuit"), brought to recover two transfers made by the Debtor. The second adversary proceeding is *O'Toole v. Radium2 Capital, LLC*, No. 21-07082 (the "Services Lawsuit" and its claims register the "Services Claims Register"), brought to recover a transfer made by Services. Citations to the docket or claims register of the procedurally-consolidated main bankruptcy case, *In re J.P.R. Mech. Inc.*, No. 19-23480, will read "Main Case" and "JPR Claims Register," respectively. Citations to the docket or claims register of the Services bankruptcy case, *In re J.P.R. Mech. Servs. Inc.*, No. 19-23481, will read "Main Services Case" and "Services Claims Register," respectively.

3

stated in the movant's statement. Radium2 did file short and somewhat conclusory declarations of its principal. *See* Aff. of Troy Caruso, JPR Lawsuit, ECF No. 39; Aff. of Troy Caruso, Services Lawsuit, ECF No. 40.

**FACTS**

In the months before filing for bankruptcy, JPR had entered into at least four agreements with Radium2, each titled "Agreement for the Purchase and Sale of Future Receipts." Of those agreements, three are at issue in these adversary proceedings: the one effective April 8, 2019, Holecek Decl. Ex. M, JPR Lawsuit, ECF No. 26-16 (the "April Agreement"), the one made as of June 28, 2019, Holecek Decl. Ex. O, JPR Lawsuit, ECF No. 26-18 (the "June Agreement"), and the one dated July 26, 2019, Holecek Decl. Ex. M, Services Lawsuit, ECF No. 27-16 (the "July Agreement" and together with the April Agreement and the June Agreement, the "Agreements"). *See* Examination of Troy C. Caruso ("Tr.") 84:2-10, 70:2-22, Holecek Decl. Ex. L., JPR Lawsuit, ECF No. 26-15. New York law governs the Agreements. April Agreement § 20; June Agreement § 20; July Agreement § 20. Each of the Agreements provides for an immediate cash advance to JPR and purports to sell twenty-five percent of JPR's future receipts to the Defendant up to certain specified targets*, see, e.g.*, April Agreement at 1, with the Defendant to collect the supposedly purchased receivables through daily transfers from JPR's designated bank account, *see, e.g.*, April Agreement at 1, and with JPR restricted from diverting revenue to affiliated businesses, *see, e.g.*, April Agreement § 13.11. The Agreements' relevant terms are detailed in this decision's legal analysis section and, to avoid repetition, not here.

On May 31, 2019, JPR wired $1,470,102.02 to the Defendant (the "May Transfer"). Debtor's May 2019 Bank Statement from Signature Bank for Account ending *6727 (the "May Statement") at 10, Holecek Decl. Ex. D, JPR Lawsuit, ECF No. 26-7. On July 3, 2019, JPR

4

wired $750,002.50 to the Defendant (the "July 3 Transfer"). Debtor's July 2019 Bank Statement from Signature Bank for Account ending *6727 (the "July Statement") at 4, Holecek Decl. Ex. E, JPR Lawsuit, ECF No. 26-8. On July 17, 2019, Services transmitted $850,000 from its bank account to the Defendant (the "July 17 Transfer" and together with the May Transfer and the July 3 Transfer, the "Transfers"). Services' July 2019 Bank Statement from Signature Bank for Account ending *6743 (the "July Services Statement") at 5, Holecek Decl. Ex. D, Services Lawsuit, ECF No. 27-7. The May Transfer and the July 3 Transfer pertain to the JPR Lawsuit and the April and June Agreements; the July 17 Transfer pertains to the Services Lawsuit and, at most, the June or July Agreements.

The Court takes judicial notice that Radium2 filed proofs of claim in sums certain, identifying itself as a "creditor" holding a "claim" against the Debtors on account of unpaid amounts under the Agreements. *See* Claims 105 and 106, JPR Claims Register; Claim 14, Services Claims Register. Further, Radium2 has failed to raise any factual dispute as to the following facts set forth in the Trustee's requests for admissions in the JPR Lawsuit:

- Defendant received the May Transfer and the July 3 Transfer.

- For the May Transfer and the July 3 Transfer, neither the Defendant nor JPR intended either transfer to be in exchange for new value to be conveyed contemporaneously.

- For the May Transfer and the July 3 Transfer, no new value was exchanged contemporaneously.

- For each obligation paid by the May Transfer or the July 3 Transfer, such obligation was paid in a manner inconsistent with the prior course of business dealings between the Defendant and JPR.

- For each obligation paid by the May Transfer or the July 3 Transfer, such obligation was paid in a manner inconsistent with the practices of Defendant's industry.

- For each obligation paid by the May Transfer or the July 3 Transfer, such obligation was paid in a manner inconsistent with the practices of JPR's industry.

- For each obligation paid by the May Transfer or the July 3 Transfer, the obligation was not incurred by JPR as part of its normal business or financial affairs with the Defendant.

- The May Transfer and the July 3 Transfer were each inconsistent with ordinary business terms.

- The May Transfer and the July 3 Transfer were made for the benefit of the Defendant or another creditor.

Reqs. for Admis. at 4-6, Holecek Decl. Ex. C, JPR Lawsuit, ECF No. 26-6. Separately, in her un-responded-to requests for admissions in the Services Lawsuit, the Trustee requested that the Defendant admit that:

1. Defendant received the July 17 Transfer.

2. The July 17 Transfer was made during the ninety days before the petition date.

3. Defendant had a right to receive the July 17 Transfer in satisfaction of or on account of a then-existing obligation or debt owed by Services at the time the July 17 Transfer was made.

4. The July 17 Transfer was for the benefit of the Defendant or a creditor.

5. At the time the Defendant received the July 17 Transfer it was a creditor of Services.

6. The July 17 Transfer, when made, was on account of an antecedent debt owed to the Defendant by Services.

6

7. Services was insolvent at the time of the July 17 Transfer.

8. The Defendant has no evidence to rebut the presumption of insolvency during the ninety days before the petition date.

9. With respect to the July 17 Transfer, the Defendant received a greater percentage of what was owed to it, with respect to the obligations or debts satisfied by the July 17 Transfer, than it would have received had the July 17 Transfer not been made and Services liquidated under Chapter 7 of the Bankruptcy Code on the petition date.

10. With respect to the July 17 Transfer, the Defendant held no fully perfected security interest in the assets of Services, other than the July 17 Transfer, equal to or exceeding the amount of the July 17 Transfer that secured satisfaction of the obligation or debt on account of which the July 17 Transfer was made.

11. Neither the Defendant nor Services intended the July 17 Transfer to be in exchange for new value to be conveyed contemporaneously.

12. No new value was exchanged contemporaneously with the July 17 Transfer.

13. For each obligation paid by the July 17 Transfer, such obligation was paid in a manner inconsistent with the prior course of business dealings between the Defendant and Services.

14. For each obligation paid by the July 17 Transfer, such obligation was paid in a manner inconsistent with the practices of the Defendant's industry.

15. For each obligation paid by the July 17 Transfer, such obligation was paid in a manner inconsistent with the practices of the industry in which Services operated.

16. For each obligation paid by the July 17 Transfer, the obligation was not incurred by Services as part of its normal business or financial affairs with the Defendant.

17. The July 17 Transfer was inconsistent with ordinary business terms.

18. The Transfers were made for the benefit of the Defendant or another creditor.

Reqs. for Admis. at 4-6, Holecek Decl. Ex. C, Services Lawsuit, ECF No. 27-6.

Defendant never responded to the Trustee's requests for admissions. Holecek Decl. ¶ 7, JPR Lawsuit, ECF No. 26-3; Holecek Decl. ¶ 7, Services Lawsuit, ECF No. 27-3. Nor did Defendant's untimely counterstatements under Local Bankruptcy Rule 7056-1 identify evidence to rebut each assertedly undisputed fact listed in the Trustee's properly submitted statements of undisputed facts.

## LEGAL STANDARDS

### A. General Procedural Rules Governing Summary Judgment

Federal Rule of Bankruptcy Procedure 7056 applies Rule 56 of the Federal Rules of Civil Procedure to adversary proceedings. Fed. R. Bankr. P. 7056. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotations omitted). Absent such a contest from the non-moving party, "[t]he moving party is entitled to a judgment as a matter of law because the non-moving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).

However, the "failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d

241, 244 (2d Cir. 2004). This Court could have deemed the Trustee's motions unopposed due to the Defendant's failure to timely file an opposition in violation of a clear order of the Court. *See Watson v. Geithner*, 355 F. App'x 482, 483 (2d Cir. 2009) (citing *Davidson v. Keenan*, 740 F.2d 129, 132 (2d. Cir. 1984)); *compare, e.g.*, Order Respecting Mots. to Withdraw, JPR Lawsuit, ECF No. 33 (setting deadline of February 12, 2025 for Defendant to file an opposition to these motions) *with* Def's. Mem. of Law in Opp'n to Trustee's Mot. for Summ. J. ("Def's. Mem. Regarding JPR"), JPR Lawsuit, ECF No. 38 (dated February 17, 2025 and filed February 19, 2025) *and* Def's. Mem. of Law in Opp'n to Trustee's Mot. for Summ. J. ("Def's. Mem. Regarding Services"), Services Lawsuit, ECF No. 39 (dated February 17, 2025 and filed February 19, 2025). Particularly because substantive review of a movant's showing is always required, this decision nevertheless takes into account Defendant's untimely opposition.

## B.   Procedural Rules Governing Requests for Admissions and Statements of Undisputed Material Fact

The Federal Rules of Bankruptcy Procedure apply Federal Rule of Civil Procedure 36 in adversary proceedings. Fed. R. Bankr. P. 7036. Under that civil rule, "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a)(3). Meanwhile, the Local Rules of this Court require parties seeking summary judgment to file a statement of the material facts as to which the moving party contends there exists no triable dispute; the non-moving party must file a counter-statement, and "[e]ach numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically

controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." S.D.N.Y. Local Bankr. R. 7056-1(d).

The Trustee incorporated into her statements of undisputed material facts the facts deemed admitted by the Defendant's failure to respond to her requests for admissions. *See* Statement of Undisputed Material Facts ¶¶ 18-52, JPR Lawsuit, ECF No. 26-2; Statement of Undisputed Material Facts ¶¶ 13-32, Services Lawsuit, ECF No. 27-2. Those facts now sit doubly outside the Defendant's challenge. The Court's analysis in this decision not only applies those facts, but also explains why some of the Defendant's untimely attempts to challenge them would fail even if not procedurally barred.

### C. Merits: 11 U.S.C. §§ 547(b), (c)

Section 547 of the Bankruptcy Code defines which transfers of a debtor's property a bankruptcy trustee may avoid as preferential. This section promotes several policies of the Code, including 1) reducing the incentives creditors have to race to the courthouse when a viable enterprise faces temporary challenges, 2) preventing failing enterprises from favoring some creditors over others, and 3) promoting equality of distribution among similarly-situated creditors. *See Butler v. David Shaw, Inc.*, 72 F.3d 437, 441 n.6 (4th Cir. 1996); *DeRosa v. Buildex Inc.* (*In re F & S Cent. Mfg. Corp.*), 53 B.R. 842, 846 (Bankr. E.D.N.Y. 1985). The provision empowers a bankruptcy trustee to avoid any transfer of an interest of the debtor in property:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--
>     (A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The Trustee has the burden to prove the Transfers avoidable under Section

547(b); if the Trustee does so, the Defendant has the burden to establish the elements of any

statutory defenses. *See id.* § 547(g). "One who relies upon an affirmative defense to defeat an

otherwise meritorious motion for summary judgment must adduce evidence which, viewed in the

light most favorable to and drawing all reasonable inferences in favor of the non-moving party,

would permit judgment for the non-moving party on the basis of that defense." *Domino Media,*

*Inc. v. Kranis*, 9 F. Supp. 2d 374, 385 (S.D.N.Y. 1998) (quoting *Frankel v. ICD Holdings S.A.*,

930 F. Supp. 54, 65 (S.D.N.Y. 1996)), *aff'd*, 173 F.3d 843 (2d Cir. 1999). Defendant's untimely

opposition papers raise the following issues:

1) Whether the Agreements are loans; if the Trustee establishes that they are, that advances the Trustee's affirmative case, and

2) Whether the Defendant and JPR and Services entered into and performed the contracts between them, including making the Transfers, in the ordinary course of business and according to ordinary business terms; if the Defendant establishes this, it would make out the ordinary transaction defense under Section 547(c)(2), and

3) Whether, through the Transfers, the Defendant received more than it would have received in a liquidation of the Debtors on the petition date.

*See* Def's. Mem. Regarding JPR at 3-9; Aff. of Troy Caruso, JPR Lawsuit; Def's. Mem.

Regarding Services at 3-9; Aff. of Troy Caruso, Services Lawsuit, ECF No. 40.

## ANALYSIS OF THE TRUSTEE'S AFFIRMATIVE CASE

### A. The Agreements are Loans

To find a transfer avoidable as a preference, a court must find that the debtor made the transfer to or for the benefit of a creditor, for or on account of an antecedent debt owed before the debtor made the transfer. 11 U.S.C. § 547(b)(1)-(2). A creditor is an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." *Id.* § 101(10)(A). The Code defines a "claim" as any:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

*Id.* § 101(5). The Code also defines a "debt" as "liability on a claim." *Id.* § 101(12). Loans to a debtor made prepetition and not paid off before the petition date count as "claims" in that debtor's bankruptcy. *Id.* § 101(5).

Thus, if the Trustee can establish that the Agreements are loans, then it will follow that 1) JPR made the May Transfer and the July 3 Transfer to a creditor and 2) JPR made the May Transfer and the July 3 Transfer "on account of an antecedent debt owed by the debtor before such transfer was made." *Id.* § 547(b). This follows because "[a] debt is incurred, for purposes of 11 U.S.C. § 547(b)(2), when it arises and not when payment becomes due." *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 347 (Bankr. S.D.N.Y. 1999) (citations omitted). Thus, if the Agreements count as loans, the Debtor made the May Transfer and the July 3 Transfer "on account of an antecedent debt owed by the debtor," 11 U.S.C. § 547(b)(2). *See Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*, No. 11-2251 (JLG), 2016 Bankr. LEXIS 834, at *31-32 (Bankr. S.D.N.Y. Mar. 17, 2016).

12

"Under New York law, the initial interpretation of a contract is a matter of law for the

court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)

(internal quotations omitted). If the Court finds the contract ambiguous, the proper interpretation

of the contract becomes a question of fact. *Id.* As to whether the Agreements constitute loans

under New York law, neither party argues that any of the contractual language here is ambiguous.

The Court therefore will evaluate that language to classify the Agreements as a matter of law. *Cf.*

*Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 500 (S.D.N.Y. 2018) ("Here, the parties

have not suggested that the Terms of Use are ambiguous. Nor have they directed the Court to any

extrinsic evidence of the contract's meaning. The Court therefore follows the parties' lead . . . .

Since the Terms of Use are unambiguous, it is for the Court to interpret them as a matter of law."

(internal citations and quotations omitted)); *see also, e.g.*, *Fleetwood Servs., LLC v. Ram Cap.*

*Funding, LLC*, No. 20-cv-5120 (LJL), 2022 WL 1997207, at *8-14 (S.D.N.Y. June 6, 2022)

(interpreting a contract as a matter of law to classify it as a loan under New York law); *In re*

*Grand Union Co.*, 219 F. 353, 356-59 (2d Cir. 1914) (same).

"The hallmark of a loan is that the lender 'is absolutely entitled to repayment under all

circumstances,' or put otherwise, the 'principal sum' 'is repayable absolutely.'" *Fleetwood*, 2022

WL 1997207, at *9 (quoting *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122

N.Y.S.3d 309, 312 (App. Div. 2d Dep't 2020)). "Under New York law, which governs the

Agreement[s], 'substance—not form—controls' when a court determines whether a transaction is

a loan." *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885-cv, 2023 WL

3882697, at *2 (2d Cir. June 8, 2023) (quoting *Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d

612, 621-22 (N.Y. 2021)). "New York courts usually weigh three factors in making that

determination: '(1) whether there is a reconciliation provision in the agreement; (2) whether the

agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.'" *Id.* (quoting *Principis Cap., LLC v. I Do, Inc.*, 160 N.Y.S.3d 325, 327 (App. Div. 2d Dep't 2022)). Within the first two of these factors, courts examine whether the merchant could practically invoke the reconciliation provision, *see Fleetwood*, 2022 WL 1997207, at *13 ("The Fleetwood Agreement nominally has a reconciliation provision . . . . But that provision functions in such a way that renders it largely illusory."), and whether, even if the agreement purports to have no maturity date, it has a "de facto fixed term," *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21 Civ. 9607 (LGS), 2022 U.S. Dist. LEXIS 129032, at *16 (S.D.N.Y. July 20, 2022).

More broadly, "[t]he 'three factors provide only a guide' to the analysis; 'they do not dictate the conclusion.'" *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 452 (S.D.N.Y. 2022) (quoting *Fleetwood*, 2022 WL 1997207, at *9). Courts also consider whether the agreement at issue identifies the accounts purchased and whether the "purchaser" may possess, use or convey them, which party bears responsibility for collecting the accounts, and the number of payments a merchant can miss before finding itself in default. *Fleetwood*, 2022 WL 1997207, at *10-11. Courts also at times consider a question the parties did not emphasize here: whether the daily payment rates appear to be good faith estimates of the merchant's revenues. *Davis v. Richmond Cap. Grp., LLC*, 150 N.Y.S.3d 2, 4 (App. Div. 1st Dep't 2021). "The root of all of these factors is the transfer of risk. Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995) (emphasis in original).

As noted, the Agreements are styled as agreements by which Radium2 purchased future receivables, with a cash payment to JPR up front and a stream of daily payments in specified amounts in exchange. April Agreement at 1; June Agreement at 1; July Agreement at 1. The Agreements allow the Debtor to request changes to the daily payment. *See* April Agreement § 2; June Agreement § 2; July Agreement § 2. However, the Debtor could request such a modification only once per month, and only on a going-forward basis. April Agreement § 2; June Agreement § 2; July Agreement § 2. Nothing in the Agreements requires the Defendant to remit back to the Debtors any amounts by which the Debtors have been overcharged during any given month. Thus, the Agreements lack true reconciliation provisions. *Compare K9 Bytes, Inc. v. Arch Cap. Funding, LLC*, 57 N.Y.S.3d 625, 632–33 (Sup. Ct. 2017) ("The reconciliation provisions allow the merchant to seek an adjustment of the amounts being taken out of its account based on its cash flow (or lack thereof). If a merchant is doing poorly, the merchant will pay less, and will receive a refund of anything taken by the company exceeding the specified percentage.") *and IBIS Cap. Grp., LLC v. Four Paws Orlando LLC*, No. 608586/16, 2017 WL 1065071, at *3 (N.Y. Sup. Ct. Mar. 10, 2017) ("In order to ensure that IBIS will not inadvertently receive any money other than the purchased future sales proceeds, the Agreement provides a reconciliation mechanism by which IBIS will return to Four Paws anything that does not represent future sales proceeds.") *with Queen Funding*, 2022 U.S. Dist. LEXIS 129032, at *15 (ruling a merchant cash advance agreement to be a usurious loan even when it had a reconciliation provision because such reconciliation provision did not bind the purported lender to actually perform the reconciliation). Applying these principles here, the Agreements lacked reconciliation provisions that would cause Radium2 not to receive more than the share of receivables purportedly purchased because the Agreements do not bind the Defendant to pay back any money collected

15

that exceeds the specified percentage of the Debtors' revenues. This factor accordingly weighs in favor of classifying the Agreements as loans.

The Agreements have no stated maturity date or finite term, but the Defendant's principal admitted in a deposition in this case, offered by the Trustee and uncontroverted by Defendant, that the Agreements had de facto fixed terms. *See* Tr. 51:20-23 (When asked "How long is this out there for?" Defendant's principal responded "They're all different. It depends. Usually it's an amount of days, it's the payment deducted by what you're purchasing."). For this reason, the Agreements lack the indefinite term that characterizes transfers of ownership. *Cf. Fleetwood*, 2022 WL 1997207, at *11 ("Richmond [the purported lender] has none of the rights of ownership—it does not have the right to possess, use, or convey any of the accounts it supposedly has purchased." (citing *Ownership, Black's Law Dictionary* (11th ed. 2019) ("Ownership rights are general, permanent, and heritable."))). As another judge in this District has observed in similar circumstances, "a de facto fixed term plausibly exists. The period of payment can be easily calculated by dividing the amount [] owe[d] by the amount of daily payments. A failure to pay will not indefinitely extend the term because the [Agreements] provide[] that a default will occur if [more than four] daily payments are not made during the term of the [A]greements and the [the Debtors] do[] not contact [the Defendant] in advance." *Queen Funding*, 2022 U.S. Dist. LEXIS 129032, at *16; April Agreement § 15; June Agreement § 15(h); July Agreement § 15(h). This factor too weighs in favor of classifying the Agreements as loans.

Although not dispositive, the third frequently-considered factor—the availability of recourse in the event of bankruptcy—does not point to classifying the Agreements as loans. The Agreements do not list the Debtor's bankruptcy as an event of default, and they even include

language contemplating that the Debtor could go into bankruptcy and not default. *See* April

Agreement § 4 ("[I]f the full Purchased Amount is never remitted because [Debtor's] business

went bankrupt . . . and [Debtor] has not breached this Agreement, [Debtor] would not owe

anything to [Defendant] and would not be in breach of or default under this Agreement."); June

Agreement § 4 (same); July Agreement § 4 (same).

However, the power of this factor is limited because Defendant is not entirely "without

recourse" in the event the Debtor's bankruptcy caused the Debtor to fail to pay the Purchased

Amount to the Defendant. The Defendant holds personal guarantees of "prompt and complete

performance of all of [Debtor's] obligations under the [Agreements]" from the Debtor's

principal, which the Defendant could exercise against the guarantor without first exercising any

remedies under the Agreements. *See* Personal Guaranty of Performance §§ 2, 4, April Agreement

Ex. A; Personal Guaranty of Performance §§ 2, 4, June Agreement Ex. A; Personal Guaranty of

Performance §§ 2, 4, July Agreement Ex. A. Furthermore, default under any of the Agreements

meant "the full uncollected Purchased Amount plus all fees and charges (including legal fees)

due under this Agreement will become due and payable in full immediately" and "[Defendant]

may debit [Debtor's] depositary accounts wherever situated by means of ACH debit or facsimile

signature on a computer-generated check drawn on [Debtor's] bank account or otherwise for all

sums due to [Defendant]." April Agreement § 16; June Agreement § 16; July Agreement § 16.

Almost any bankruptcy filing and the resulting automatic stay – especially the Chapter 7

liquidation the Debtor filed – would necessarily "interfere[] with [Defendant's] right to collect,"

April Agreement § 15; June Agreement § 15; July Agreement § 15, and therefore cause a default.

Furthermore, it seems unlikely that, in the event of bankruptcy, the Debtor could or would avoid

another contractual event of default by "provid[ing] timely notice to [the Defendant] such that in

any given calendar month" no more than four "ACH transactions attempted by [Defendant]" would be rejected by Debtor's bank. *See* April Agreement § 15; June Agreement § 15; July Agreement § 15. Thus, the Agreements' provisions, despite not expressly defining bankruptcy as an event of default, make events that almost certainly would occur if a "seller of receivables" commenced a bankruptcy count as defaults, with results including triggering the personal guarantees. However, as the scope of the guarantor's liability does not extend beyond the scope of the Debtor's liability, this factor may weigh slightly but not decisively against classifying the Agreements as loans. *See Pirs Cap., LLC v. D & M Truck, Tire & Trailer Repair Inc.*, 129 N.Y.S.3d 734, 740 (Sup. Ct. N.Y. Cnty. 2020) ("At the same time, though, the scope of O'Neil's obligations under the recourse provision of the guarantee is itself limited by the contingent nature of the *merchant's* obligations under the Agreement in light of the reconciliation provision.").

From a broader perspective, the Agreements have little similarity to an asset sale despite purporting to be one. The Defendant "purchased" a specified percentage of "all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card . . . or other form of monetary payment in the ordinary course of [the Debtor's] business." April Agreement at 1; June Agreement at 1; July Agreement at 1. "That language is so broad as to be essentially vacuous. It captures not just future accounts from [Debtor's] customers but gives [Defendant] the right to *all* [Debtor's] revenues[.]" *Fleetwood*, 2022 WL 1997207, at *11 (emphasis in original). Meanwhile, the Agreements lack provisions one would expect of a true asset purchase; for example, they do not empower the Defendant to collect directly from any of the Debtor's customers, and they do not identify any specific accounts receivable purchased by the Defendant. And, as the *Fleetwood* court found to be a significant indicator of a loan, "so long as [Debtor] has enough money to cover the daily payment amount . . . [the Debtor] can use the

proceeds [] however it likes—the receipts need not be deposited in an escrow account or otherwise held in trust for [Defendant's] benefit. [Debtor] enjoys the use of the proceeds." *Id.*

Further, under the Agreements, the Debtor, rather than the Defendant, faces the risk that any specific customer will fail to pay; a customer's failure to pay will not reduce the amount that the Debtor must transfer to the Defendant, or, put another way, the Debtor owes Radium2 the same daily amount whether Debtor does or does not collect on any given receivables, or all receivables. And, if the "Initial Daily Amount," *see* April Agreement at 1; June Agreement at 1; July Agreement at 1, is not in the Debtor's bank account when Defendant seeks to draw it, "[the Defendant] is entitled to remedies against [the Debtor] and not against the account debtors." *Fleetwood*, 2022 WL 1997207, at *10. These economic features, most fundamentally the reality that the Debtor bears the risk of non-collection of receivables with Radium2 bearing little if any of that risk, powerfully show the Agreements to be loans.

Finally, there is a virtually dispositive undisputed fact here: Radium2 has admitted under oath in proofs of claim that it filed in the JPR bankruptcy case that it is a "creditor" who has a "claim" for money it is owed by JPR. Radium2 filed Claims 105 and 106 against JPR on January 15, 2020. *See* JPR Claims Register. The proofs of claim filed by the Defendant state, "This form is for making a claim for payment in a bankruptcy case"; "Who is the current creditor?" to which the Defendant responded "Radium2 Capital, LLC"; and "How much is the claim?" to which the Defendant respectively responded "$1,854,474.86," and "$1,638,975.00." *See* Claims 105 and 106, JPR Claims Register. The Defendant's attorney signed the proofs of claim under penalty of perjury. For these reasons, the Defendant cannot deny that it is a creditor of the Debtor under 11 U.S.C. § 547(b)(1).

Weighing all the factors reviewed above, there is no genuine dispute of material fact that the Debtor made the Transfers to the Defendant "to or for the benefit of a creditor" and "on account of an antecedent debt owed by the debtor."

## B. The Defendant Has Also Admitted It Received the July 17 Transfer from Services on Account of an Antecedent Debt

The admitted facts cause the same result as to the July 17 Transfer at issue in the Services Lawsuit. The Defendant admitted 1) that it received the July 17 Transfer "in satisfaction of or on account of a then-existing obligation or debt owed to Defendant" by Services, 2) that "[t]he July 17 Transfer was for the benefit of Defendant," 3) that "[a]t the time Defendant received the July 17 Transfer, Defendant was a creditor of" Services, and 4) that the July 17 Transfer "was, at the time it was made, on account of an antecedent debt owed to Defendant by" Services. Statement of Undisputed Material Facts ¶¶ 16, 18-21, Services Lawsuit (citing Reqs. for Admis. at 4, Services Lawsuit). These admitted facts establish that the July 17 Transfer was a "transfer of an interest of the debtor in property (1) to or for the benefit of a creditor [and] (2) for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(1)-(2). In addition, Radium2 filed Claim 14 against Services on the same day it filed Claims 105 and 106 against JPR. *See* Services Claims Register. That proof of claim, like the others, states, "This form is for making a claim for payment in a bankruptcy case"; "Who is the current creditor?" to which the Defendant responded "Radium2 Capital, LLC"; and "How much is the claim?" to which the Defendant responded "$1,638,975.00." *See* Claim 14, Services Claims Register. The Defendant's attorney signed the proof of claim under penalty of perjury. For these reasons, the Defendant cannot deny that it is a creditor of Services under 11 U.S.C. § 547(b)(1).

### C.  The Transfers Occurred Within the 90 Days Before the Petition Date

The Debtor made the May Transfer on May 31, 2019 and the July 3 Transfer on July 3, 2019. May Statement at 10; July Statement at 4. Services made the July 17 Transfer on July 17, 2019. July Services Statement at 5. The Debtor and Services filed for bankruptcy on August 16, 2019. Radium2 disputes none of these facts, which the Trustee has established in support of her motion. As all Transfers occurred after May 18, 2019, the Transfers occurred within the 90 days before the petition date.

### D.  The Insolvency of JPR and Services

Section 547(f) of the Bankruptcy Code presumes a debtor insolvent "on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). "Where the transferee offers no evidence regarding solvency, the trustee may rely upon the statutory presumption." *In re Ajayem Lumber Corp.*, 143 B.R. 347, 351 (Bankr. S.D.N.Y. 1992). The Defendant's (untimely) opposition and the affidavit and counterstatement regarding material facts offer no evidence of Debtors' solvency at the time of the Transfers and do not otherwise challenge this presumption with respect to either JPR or Services. The Trustee thus has met her burden on this element in both lawsuits.

### E.  The Defendant Received More Than It Would Have in a Liquidation of JPR

There also is no genuine dispute that, had the Transfers not been made, the Defendant would not have received as much as it received through the Transfers for the debts JPR owed to it. Dime Community Bank held a UCC-1 financing statement dated January 17, 2019 encumbering all JPR's personal property and fixtures, including all bank accounts. UCC Financing Statement, Holecek Decl. Ex. Q, JPR Lawsuit, ECF No. 26-20. This financing

statement predated the Agreements, and the Defendant does not challenge the financing statement's validity.

The Defendant argues that it could have recovered the Transfers through the Chapter 7 liquidation process even if they had not been made because the Defendant had "purchased" the "receivables" at issue. Under the strongest version of the Defendant's argument, through its asserted status as a "purchaser" under N.Y. U.C.C. Law § 9-332(b) it could have claimed the funds at issue from the Debtor's bank account free from the interest of Dime Community Bank. However, as found above, the Defendant never did "purchase" any receivables but rather made a loan to the Debtor. For this reason, had the Transfers not been made, the Defendant could not have successfully asserted its status as a "purchaser" to claim funds from the Debtor's bank account free of other parties' interests; it would have been determined to be a creditor with interests junior to those of Dime Community Bank. And there is no dispute that the liquidation of JPR and Services would yield creditors who were junior to Dime Community Bank little if anything, and decidedly less than the substantial payments whose avoidance the Trustee seeks.

Finally, although this decision's discussion of this element omits some corroborating detail, further discussion is unnecessary because the element's satisfaction is established by the Defendant's deemed admission of facts included in the Trustee's statement of undisputed facts. *See* Statement of Undisputed Material Facts ¶¶ 35-36, JPR Lawsuit (citing Reqs. for Admis. at 5, JPR Lawsuit).

### F.  The Defendant Received More Than It Would Have in a Liquidation of Services

Similarly, the Defendant concedes that the July 17 Transfer caused it to receive more than it would have received in a liquidation of Services absent that transfer. The Defendant admits "Defendant received a greater percentage of what was owed to Defendant (with respect to the

obligation(s) or debt(s) satisfied by the July 17 Transfer) than Defendant would have received if the July 17 Transfer had not been made and [Services] conducted a liquidation of its business pursuant to Chapter 7 of the Bankruptcy Code on the Petition Date." Statement of Undisputed Material Facts ¶ 24, Services Lawsuit (citing Reqs. for Admis. at 5, Services Lawsuit). For this reason, the July 17 Transfer counts as preferential, because through it the Defendant received more than it would have in the counterfactual situation in which Services never made the July 17 Transfer and liquidated on the petition date.

In sum, no genuine issues of material fact exist on any of the elements of Section 547(b) in either lawsuit, and, again, this conclusion is reinforced by the failure of Radium2 to respond to the Trustee's requests for admissions. The Trustee thus has established by uncontroverted evidence every element of her affirmative case that the Transfers qualify as avoidable preferences.

## RADIUM2'S ONLY NON-WAIVED DEFENSE (THE ORDINARY TRANSACTION DEFENSE) FAILS

As noted above, the Defendant has the burden to prove each element of each affirmative defense it asserts under 11 U.S.C. § 547(c). 11 U.S.C. § 547(g). The Defendant's answers asserted multiple affirmative defenses under Section 547(c). However, as also noted above, in its (untimely) opposition briefs and supporting documents the Defendant argued and cited evidence to support only one of those defenses, the ordinary transaction defense of 11 U.S.C. § 547(c)(2). Defendant thereby waived the remainder of its asserted affirmative defenses for purposes of this motion. *Domino Media, Inc. v. Kranis*, 9 F. Supp. 2d 374, 385 (S.D.N.Y. 1998) ("One who relies upon an affirmative defense to defeat an otherwise meritorious motion for summary judgment must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on

23

the basis of that defense." (quoting *Frankel v. ICD Holdings S.A.*, 930 F. Supp. 54, 65 (S.D.N.Y. 1996))), *aff'd*, 173 F.3d 843 (2d Cir. 1999); *see also Internet L. Libr., Inc. v. Southridge Cap. Mgmt., LLC*, No. 01 Civ. 6600 (RLC), 2005 WL 3370542, at *4 (S.D.N.Y. Dec. 12, 2005) (quoting same), *aff'd sub nom. ITIS Holdings Inc. v. Southridge Cap. Mgmt. LLC*, 329 F. App'x 299 (2d Cir. 2009); *Am. Auto. Ins. Co. v. Advest, Inc.*, No. 08 CIV. 6488 (LAK), 2009 WL 3490060, at *2 (S.D.N.Y. Oct. 28, 2009) ("[W]here the nonmoving party relies upon an affirmative defense to defeat summary judgment, it must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense." (internal quotations omitted)).

To establish the ordinary transaction defense, a defendant must prove that 1) the debtor incurred the debts at issue in the ordinary course of the business or financial affairs between itself and the transferee and 2) either (A) the transfer at issue was made in the ordinary course of business of the debtor and the defendant (thus making it "subjectively" ordinary) or (B) the transfer at issue was made according to ordinary business terms (thus making it "objectively" ordinary). *See* 11 U.S.C. § 547(c). As detailed below, Radium2 failed to respond to requests for admission of facts that establish the non-applicability of this defense. That alone is dispositive, and, at any rate, the defense lacks merit.

### A.  The Ordinary Transaction Defense Fails on the Merits in the JPR Lawsuit

While the Debtor may have entered into the Agreements in the ordinary course of business, neither the May Transfer nor the July 3 Transfer were subjectively ordinary, and the Defendant points to no facts showing either was objectively ordinary.

24

In the ordinary course of business between them, JPR paid $13,673.47 per day to the Defendant under the April Agreement and intended to pay $107,142.86 per day to the Defendant under the June Agreement. *See* April Agreement at 1; June Agreement at 1. The May Transfer, for $1,470,102.02, *see* May Statement at 10, vastly exceeded the size of the daily payments under the April Agreement. It also far exceeded the 25% "specified percentage" of that day's receipts in JPR's designated bank account. *See id.* at 4-5. The Defendant has the burden to show such a transfer is "ordinary," 11 U.S.C. § 547(g), and the Defendant's papers give no explanation and identify no facts to support the improbable conclusion that a transfer from a debtor to a defendant that is more than 100 times larger than the routine transfers required by their contract falls within the ordinary course of business. This is especially so because the April Agreement lacked any set maturity date and, according to the Defendant's own expectations, its de facto maturity date fell in mid-November 2019, *see* Transaction History at 1, Holecek Decl. Ex. I, JPR Lawsuit, ECF No. 26-12 (listing an "E. Remittance Date" for the April Agreement as November 12, 2019). *Cf. HLI Creditor Tr. v. Metal Techs. Inc.* (*In re Hayes Lemmerz Int'l, Inc.*), 337 B.R. 49, 54, 60, 62 (Bankr. D. Del. 2006) (ruling that a payment made five days ahead of a contractual repayment date counted as a payment made outside the ordinary course of business).

JPR also never made any of the contemplated seven $107,142.86 daily payments that were supposedly called for under the June Agreement, *see* Transaction History at 2; with respect to the June Agreement, Defendant's only payment was the July 3 Transfer of $750,002.50, *see id.*; *see also* July Statement at 4-10. The absence of any other payments puts the lie to any suggestion that the standalone payment of $750,002.50 was in the ordinary course of business; that payment too falls outside the protection of Section 547(c)(2)(A).

The Defendant argues that because (allegedly) the Debtor and the Defendant made the Agreements in the ordinary course of business, "the ordinary course of business defense is applicable to repayment of such debt." Def's. Mem. Regarding JPR at 7. Leaving aside the Trustee's disagreement that JPR and the Defendant made the Agreements in the ordinary course of business, the Defendant's argument errs on the law. The statute states, "The trustee may not avoid under this section a transfer to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, **and** such transfer was made in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(A) (emphasis added). The Defendant must prove that it and the Debtor made the Agreements in their ordinary course of business **and** that JPR made the transfers at issue in the ordinary course of business. *See Kapila v. Media Buying, Inc.* (*In re Ameri P.O.S. Inc.*), 355 B.R. 876, 883-84 (Bankr. S.D. Fla. 2006) (emphasis added) (evaluating these two questions separately). The authorities cited by the Defendant are not to the contrary and thus fail to support its position. Each cited case analyzes the question of ordinariness of the contract separately from the question of the ordinariness of the challenged transfer. *See id.*; *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273-74 (Bankr. W.D. Okla. 1986). The undisputed facts here show that JPR made neither the May Transfer nor the July 3 Transfer in the ordinary course of business between itself and the Defendant, and that alone defeats Defendant's asserted defense.

In addition, the Defendant presents no argument that the Debtor made the Transfers according to ordinary business terms. The Defendant's purported Local Rule 7056-1 counterstatement says conclusorily, "Defendant received payments consistent with the industry standard," Def's. Counterstatement ¶ 4, JPR Lawsuit, ECF No. 40, but that paragraph's citation

to the affidavit of the Defendant's principal for factual support fails. The affidavit of the Defendant's principal makes no factual allegation that the Transfers occurred according to ordinary business terms as would arise between other parties to transactions like these. *See* Aff. of Troy Caruso, JPR Lawsuit (nowhere mentioning how other parties in the Debtor's industry or the Defendant's industry tend to make payments under contracts like these). The belated and conclusory statement in the Defendant's counterstatement is also foreclosed by JPR's failure to respond to the Trustee's request that the Defendant admit that the May Transfer and the July 3 Transfer were "inconsistent with ordinary business terms." Reqs. for Admis. at 6, JPR Lawsuit. As the Defendant never responded to the requests for admissions, the Defendant has admitted the May Transfer and the July 3 Transfer were inconsistent with ordinary business terms. *See* Holecek Decl. ¶ 7, JPR Lawsuit; Fed. R. Bankr. P. 7036; Fed. R. Civ. P. 36(a)(3).

**B.  The Admitted Facts Mean the Ordinary Transaction Defense Fails in the Services Lawsuit**

The record shows that Services made the July 17 Transfer to the Defendant outside of the ordinary course of business. The July Services Statement records five payments of $400.00 each made by Services to the Defendant in July 2019 leading up to the $850,000.00 July 17 Transfer. *See* July Services Statement at 4-5.

The admitted facts also establish that the ordinary transactions defense cannot protect the July 17 Transfer. Per the Statement of Undisputed Material Facts in the Services Lawsuit, "For each invoice or other obligation paid by the July 17 Transfer, the invoice or obligation was not incurred by [Services] as part of its normal business or financial affairs with Defendant." Statement of Undisputed Material Facts ¶ 31, Services Lawsuit (citing Reqs. for Admis. at 6, Services Lawsuit).

The Defendant has also admitted by operation of Rule 7036 and Local Bankruptcy Rule 7056-1 that "for each invoice or other obligation paid by the July 17 Transfer," such "obligation was paid later, earlier, or in a manner otherwise inconsistent with" 1) "the prior course of business dealings" between the Defendant and Services, 2) "the general practices of Defendant's industry," and 3) the general practices of the industry in which Services operated. *Id.* ¶¶ 28-30 (citing Reqs. for Admis. at 5, Services Lawsuit). Lastly, by not controverting the facts set forth in the Statement of Undisputed Material Facts, Defendant has admitted that "The July 17 Transfer made by [Services] was inconsistent with ordinary business terms." *Id.* ¶ 32 (citing Reqs. for Admis. at 6, Services Lawsuit).

To the extent the Defendant challenges any of this in its untimely opposition papers, it makes the same futile argument it made in the JPR Lawsuit: that because (allegedly) Services and the Defendant made their agreement in the ordinary course of business, "the ordinary course of business defense is applicable to repayment of such debt." Def's. Mem. Regarding Services at 7. This argument fails because the Defendant must show both that it made its agreement with Services in the ordinary course of business **and** that Services made the July 17 Transfer either 1) in the ordinary course of business or 2) according to ordinary business terms. Proof of the first element does not prove either of the latter two alternative elements. At no point did the Defendant cite any evidence in the record in its favor regarding whether the July 17 Transfer occurred in the ordinary course of business or according to ordinary business terms. Thus, the Defendant's ordinary transaction defense fails in both lawsuits.

## THE COURT DISALLOWS DEFENDANT'S CLAIMS

The Trustee has established that the Transfers count as avoidable preferences under Section 547(b) and that the Defendant has no defenses that protect the Transfers. Accordingly,

under Section 550 of the Bankruptcy Code, the Trustee may recover the value of the Transfers

from the Defendant. 11 U.S.C. § 550(a). For the same reason, because no party has disputed that

the Defendant also has not "paid the amount[] or turned over any such property[] for which [the

Defendant] is liable" under 11 U.S.C. § 550, *see id.* § 502(d), the Court disallows all the

Defendant's claims against JPR and Services. To be precise, the Court disallows Claims No. 105

and 106 filed against JPR and Claim No. 14 filed against Services.

## **CONCLUSION**

The Court GRANTS the Trustee's motions and overrules the Defendant's objections to

them. The Trustee shall submit an order effectuating this ruling. Defendant's time to appeal will

run from the entry of that order.

It is so ordered.


Dated: New York, New York
       May 30, 2025

                                    *s/ David S. Jones*
                                    Honorable David S. Jones
                                    United States Bankruptcy Judge

29